## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DeBarreto<br>v.<br>INS | Civil No. 3:02cv283 (PCD)<br><br>March 2, 2005 |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Since filing of Ms. Saavedra DeBarreto's ("Ms. Saavedra") petition for habeas corpus and the government's reply, parties agreed that the Drug Enforcement Administration would prepare a threat assessment regarding the petitioner's past cooperation with the government and danger to her if she were to be removed to Colombia. The threat assessment confirms that Ms. Saavedra cooperated extensively with the DEA, including testifying in open court against a leading drug cartel figure, and that Ms. Saavedra and her family have been threatened repeatedly since then. DEA, *Threat Assessment for Yolanda Saavedra* ("DEA Threat Assessment"), attached as Exhibit A. In a companion document, *Request for Significant Public Benefit Parole Template* ("DEA Parole Request"), DEA Agent Fred DiRenzo stated:

> Saavedra's assistance and success with the DEA has resulted in numerous threats to her life as well as to the lives of her children. Her deportation to Colombia could result in serious injury or death.

*Request for Significant Public Benefit Parole Template*, attached as Exhibit B, at 2. The DEA's assessment resolves any factual controversies in the case.

Ms. Saavedra seeks a writ of habeas corpus to the respondent to prevent the respondent United States Immigration and Customs Enforcement ("USICE") from removing her to Colombia. At the government's request, Ms. Saavedra repeatedly provided information and testimony against high-level members of the Cali drug cartel, and if she is removed to Colombia, she is likely to be killed in retribution for her cooperation. Having solicited her cooperation, the government has an obligation under the due process clause of the Fifth Amendment to not place her in such peril. *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (state-created danger); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (protecting police informants); *Rosciano v. Sonchik*, 2002 U.S. Dist. LEXIS 25419 (D. Ariz.) (enjoining removal of informant against drug cartels to Colombia); *Builes v. Nye*, 239 F. Supp. 2d 518 (M.D. Pa. 2003) (same); *G-69 v. Degnan*, 745 F. Supp. 265 (D.N.J. 1990) (the government has a duty to protect informants).

The Court should grant the writ. The Court has jurisdiction to hear the case as Ms. Saavedra exhausted her remedies by filing a motion to reopen which was denied by the Immigration Court and BIA. *U.S. v. Perez*, 330 F.3d 97, 100-01 (2d Cir. 2003). Regarding the merits of the claim, there is no dispute that the government solicited Ms. Saavedra's cooperation repeatedly in investigating and prosecuting Cali drug cartel figures, knowingly placing Ms. her at risk. This is the critical element of the state-created danger theory. See discussion at 14-23, below.

**FACTS**

1.   Yolanda Saavedra de Barreto, a native and citizen of Colombia, was admitted to permanent residence on November 4, 1982 based on a petition filed by her ex-husband, a United States citizen. Immigration Court Exhibit 10.

2.   Ms. Saavedra pled guilty to conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846 on August 27, 1993. Plea Transcript, attached to First Am. Habeas Pet. as Exhibit A.

3.   For the five years following her August 1993 conviction, Ms. Saavedra served as an informant in Justice Department prosecutions of South American drug dealers. She repeatedly testified in open court against members of the Cali, Colombia drug cartel. Based on what the U.S. attorney and the presiding district court judge considered her "substantial assistance," she was sentenced to no jail time and five years probation, a downward departure from the sentencing guideline range of fifty-seven to seventy-one months of imprisonment for her offense. District Court Judgment, attached to First Am. Habeas Pet. As Exhibit D.

4.   John P. Coffey, the former Assistant U.S. Attorney who coordinated Ms. Saavedra's activities on the government's behalf, describes her as "the most effective cooperator with whom I worked." He describes her cooperation in multiple cases, including one "that led to the break-up of a Colombian-based scheme to export hundreds of kilograms of cocaine per month..." Letter of John P. Coffey, dated December 3, 2001, attached to First Am. Habeas Pet. as Exhibit E.

5.   The Drug Enforcement Administration (DEA) prepared a *Threat Assessment for Yolanda Saavedra* at the request of the U.S. Attorney's Office. That assessment states in part:

> On December 15, 1992, the Drug Enforcement Administration (DEA), New York Field Division (NYFD), Group D-23 made several arrests off individual in a conspiracy to distribute several kilograms of cocaine throughout the New York Metropolitan area. Yolanda SAAVEDRA subsequently became a cooperating defendant for the Drug Enforcement Administration. Since 1992, Yolanda SAAVEDRA has been providing information and services to NYFD, GROUP D-23.

SAAVEDRA testified against Matilda HERRERA in March 1994. HERRERA was charged with conspiracy to import cocaine into the United States and sentenced to over 10 years in prison. SAAVEDRA claims that she was approached by HERRERA'S sister during a court recess. HERRERA'S sister threatened SAAVEDRA by saying 'things are not going to say like this.' Matilda HERRERA is part of a violent drug cartel in Cali, Colombia. It has been reported that HERRERA had her brother killed in Columbia.

Sometime in 1998 or 1999, SAVEDRA'S son, Mauricio and daughter Marta were telephoned at different locations in Colombia on separate occasions and threatened. Marta subsequently moved herself and her children to SAAVEDRA'S mother's house in Buga Valle, Colombia. Marta was also telephoned there by a stranger who threatened her and wanted to know the whereabouts of her mother, SAAVEDRA. Marta feared for her life and the lives of her children and immediately moved back to the U.S.

In 2003, Juan Carlos Trujillo approached SAAVEDRA'S son, Mauricio at a Western Union in Cali, Colombia. Trujillo said to Mauricio, 'tell your mother I've located her co-informant.' Trujillo is an associate of the RODRIQUEZ family. The RODRIQUEZ organization is reportedly a well established, violent cartel in Columbia. SAAVEDRA and another DEA Confidential Source were instrumental in providing information that led to the arrest of Jorge LNU, an associate of the RODRIQUEZ family. In addition, $700K in U.S. currency and 280 grams of heroin were seized.

Ms. Saavedra has a criminal record but the DEA does not believe she poses a threat to the community. She is expected to abide by the laws of the United States and is willing to testify in any criminal trials. Ms. Saavedra's prior cooperation with the DEA resulted in 81 arrests, the seizures of 4 kilograms of heroin, 850 kilograms of cocaine and over $3 million dollars in U.S. currency.

These threats have been corroborated with Special Agents that have worked with SAAVEDRA on previous narcotics investigations.

*Threat Assessment for Yolanda Saavedra*, attached as Exhibit A.

6.   In a companion document, *Request for Significant Public Benefit Parole Template*,

DEA Agent Fred DiRenzo stated:

> Saavedra's assistance and success with the DEA has resulted in numerous threats
> to her life as well as to the lives of her children. Her deportation to Colombia
> could result in serious injury or death.

*Request for Significant Public Benefit Parole Template*, attached as Exhibit B.

7.   Ms. Saavedra filed a Motion to Reopen with the Immigration Court seeking to reopen

her removal case in order to apply for INA § 212(c) relief from removal. Former INA §

212(c) grants the Attorney General discretion to permit long-term permanent residents with

criminal convictions to retain their permanent residence. Applications for INA § 212(c) relief

are decided by Immigration Judges, who evaluate positive and negative factors in the

noncitizen's case in determining whether to grant relief. Positive factors include the

noncitizen's family ties and long residence and employment in the U.S. Negative factors

include the noncitizen's criminal record and other evidence of bad character or immigration

violations. *Matter of Marin*, 16 I&N Dec. 581 (BIA 1978).

8.   Ms. Saavedra was facially eligible for INA § 212(c) relief in that she had been a

permanent resident for longer than seven years and had been incarcerated for less than five

years for her criminal convictions.[1] However, it is undisputed that when Ms. Saavedra was

admitted to permanent residence on November 4, 1982 she did not declare a prior deportation

on her immigrant visa application.

9.   The critical issue in consideration of the motion to reopen was whether Ms.

Saavedra's inadmissibility at the time that she was granted permanent residence in 1982

(based on the deportation order entered against her in 1980) renders her ineligible for INA §

212(c) relief. A 1986 decision of the Ninth Circuit, *Monet v INS*, 791 F.2d 752 (9th Cir.

---

[1] Aside from her drug conviction, she was sentenced to serve three months for violating her
probation on her drug conviction, Immigration Court Exhibit 6, and she paid a $350 fine for a
1988 prostitution conviction in New York. Immigration Court Exhibit 9.

1986), suggests that an individual who is inadmissible at time of entry cannot receive INA §

212(c) relief. In her motion, Ms. Saavedra argued that there is no Second Circuit or BIA

precedent decision holding that inadmissibility at the time of admission is a bar to INA

212(c) relief and that the statute should be read to allow an individual like Ms. Saavedra who

was inadmissible when she was granted permanent residence to apply for INA § 212(c) relief

in order to avoid significant constitutional questions raised by the Ninth Circuit's reading of

the statute. Ms. Saavedra also sought to have her untimely motion considered beyond the

normal ninety-day time limit based on the proposed rule, 67 Fed. Reg. 52627 (Aug. 13,

2002), attached to First Am. Habeas Pet. As Exhibit C, allowing late filing of special motions

to reopen for INA § 212(c) relief in all "*St. Cyr*" cases – those where noncitizens entered

guilty pleas before April 1, 1997 and were eligible to apply for INA § 212(c) relief at the

time they pled guilty.

    10. In a written decision dated November 14, 2002, attached to First Am. Habeas Pet. as

Exhibit F, the Immigration Judge denied the motion, holding that the motion was untimely

and that the proposed rule "in fact, may never be implemented." Decision of the Immigration

Judge, November 14, 2002, at 5. On the merits, the court cited *Monet*, the 9th Circuit case, as

authority, and held that it "would deny the Respondent's motion to reopen because she was

inadmissible at the time her visa was granted." Id. The court concluded

> The Respondent also asks this Court to sua sponte grant the motion to reopen in
> order to consider the constitutional issue of the government's role in the danger
> the Respondent would allegedly face is she returned to Colombia. Courts,
> however, are without equitable powers to moderate or avoid statutory mandates of
> the immigration laws.

Id. Ms. Saavedra appealed the Immigration Judge's decision to the Board of Immigration

Appeals. BIA Notice of Appeal, attached to First Am. Habeas Pet. as Exhibit G. On March 5,

2003, the BIA dismissed the appeal in a brief, one-member decision. The BIA decision states:

> PER CURIAM. The respondent has filed an appeal from the Immigration Judge's decision to deny the motion to reopen.
>
> The Immigration Judge originally rendered a decision in this matter on December 19, 2001. The respondent filed a motion to reopen before the Immigration Judge on October 15, 2002. On November 14, 2002, the Immigration Judge denied the respondent's motion on the grounds that the motion to reopen removal proceedings had not been filed in a timely manner. In the instant case, a motion to reopen would have been due on or before March 19, 2002. We agree with this determination. *See* 8 C.F.R. §§ 3.23 (c)(2), 3.23(b)(1) (stating that a motion to reopen must be filed within 90 days of a final administrative decision). *See also* 8 C.F.R. § 3.23(b)(4)(i) (exceptions).
>
> Because the respondent did not file a timely motion before the Immigration Judge, we find no reason to disturb the denial of that motion.
>
> Accordingly, the appeal is dismissed.

*In re: Saavedra*, A37 471 341-Hartford (BIA 2003), attached as Exhibit A.

11. In November 2004, Matilde Herrera completed her sentence at Danbury FCI. In the Fall of 2004 Ms. Saavedra, through counsel, advised the U.S. Attorney's Office, which in turn advised the USICE, that Ms. Herrera would be transferred to York Correctional Institution (York CI) unless USICE took steps to house her elsewhere pending her removal from the United States.

12. USICE placed Ms. Herrera at York CI from early November until she was removed to Colombia on December 28, 2004. York CI agreed to Ms. Saavedra's requests that she be restricted to an isolated unit where she would not be in physical contact with Ms. Herrera, and that she be permitted to forgo medical, religious and other services that might place her in Ms. Herrera's proximity. However, despite these measures, Ms. Herrera learned that Ms.

Saavedra was detained at York CI and told other Spanish-speaking inmates to tell Ms.

Saavedra that "There is nothing I can do here, but in Colombia, I can do a lot."

## ARGUMENT

## A.    THE DISTRICT COURT HAS JURISDICTION OVER MS. SAAVEDRA'S PETITION FOR A WRIT OF HABEAS CORPUS.

The District Court has jurisdiction over Ms. Saavedra's petition for a writ of habeas

corpus because she has met all judicial and statutory exhaustion requirements.

### 1.    Ms. Saavedra's motion to reopen to the Immigration Judge and subsequent appeal of the denial of the motion to the BIA exhausted all available administrative appeals.

The Second Circuit has held that both judicial and statutory exhaustion requirements are

applicable to petitions for a writ of habeas corpus from noncitizens detained pursuant to a

judgment of deportability. *See Beharry v. Ashcroft*, 329 F.3d 51, 56-63 (2d Cir. 2003).

Although Ms. Saavedra did not appeal her order of deportability issued by the Immigration

Judge ("IJ"), she did file a motion to reopen her case with the IJ and after her motion was

denied, she appealed that decision to the Board of Immigration Appeals ("BIA").  After the

BIA denied her appeal, she filed this action for a writ of habeas corpus.  Filing a motion to

reopen her case with the IJ, and appealing its denial to the BIA, was enough to meet both

judicial and statutory exhaustion requirements. *U.S. v. Perez*, 330 F.3d 97, 100-101 (2d Cir.

2003); *U.S. v. Copeland*, 376 F.3d 61, 67 (2d. Cir. 2004).

In *Perez* the government challenged habeas jurisdiction, arguing that Perez had failed to

exhaust administrative remedies when he failed to appeal his initial deportation order to the

BIA. *Id*. at 100-101.  The Second Circuit upheld the District Court's grant of habeas, finding that,

> Although Perez did not appeal his deportation order to the BIA, he has satisfied the exhaustion requirement by appealing the denial of his motion to reopen to the BIA.

*Id*. The Court held that filing a motion to reopen with the IJ, and appealing its denial to the BIA, before filing a petition for a writ of habeas corpus, was enough to satisfy the exhaustion requirements in his case,

> Regardless of whether an appeal of a denial of a motion to reopen is sufficient to constitute exhaustion of all claims, an issue we need not reach, *it is sufficient for due process claims.*

*Id*. at 101 (emphasis added).

Like Mr. Perez, Ms. Saavedra filed a motion to reopen her case with the IJ based on a due process claim, and appealed the denial of this motion to the BIA, before filing this petition for a writ of habeas corpus.  Therefore, under *Perez*, she has sufficiently exhausted administrative remedies such that the Court can consider the merits of her claim. *Perez*, 330 F.3d at 100-101.  The government's jurisdictional argument under *Mejia-Ruiz v. INS*, 51 F.3d 358 (2d Cir. 1995), that this Court lacks the authority to review petitioner's claim, is inapplicable to Ms. Saavedra because she has met all exhaustion requirements.

**B.     MS. SAAVEDRA'S REMOVAL TO COLOMBIA WOULD VIOLATE HER SUBSTANTIVE DUE PROCESS RIGHTS.**

The Second Circuit, in *Dwares v. City of New York*, recognized that the substantive rights protected by the due process clause are implicated when the government has "assisted in creating or increasing the danger" of harm faced by someone in a particular situation. 985 F.2d 94, 99 (2d Cir. 1993).  Under this "state created danger" theory of liability, "A

state…may be liable for an individual's safety under a "danger creation" theory if it created the danger that harmed that individual" even if the danger of harm comes from a private actor. *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).  The doctrine of "state created danger," imposing a duty upon government officials to refrain from creating a danger of harm to a potential victim, has been accepted by the Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits. *See Momennia v. Estradia*, 268 F. Supp. 2d 679, 687-688 (N.D. Tex. 2003) (string cite).

The "state created danger" theory has been contrasted with the "special relationship theory" stated by the Supreme Court in *DeShaney v. Winnebago County*, in which it held that, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals."  489 U.S. 189, 198 (1989).  In situations where the "special relationship theory" is implicated, the Court generally asks whether the government has "restrain[ed] an individual's liberty [such] that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." *Id*. at 200.  The government must have affirmatively assumed a duty of care in order to create the "special relationship" necessary to trigger the duty of care and protection. *Id*.  With the "state created danger" theory, however, the government need not affirmatively assume a duty of care, it merely needs to "affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001).  This theory creates liability even if the harm results from the actions of private parties,

> If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Kneipp v. Tedder*, 95 F.3d 1199, 1207 (3d Cir. 1996)  (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)).  "The state would be a doer of harm" by deporting Ms. Saavedra to Colombia "just as the Roman state was a doer of harm when it threw Christians to lions." *Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990).

Most Courts have held that there are essentially three elements in a case of "state created danger."  The first is "the key element…a determination that the state actor created the danger to the plaintiff or at least made him more vulnerable to it." *McClendon v. City of Columbia*, 258 F.3d 432, 438 (5th Cir. 2001), *aff'd en banc*, *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002).  The second element is some degree of culpability in the government agents involved, either, "(1)an intent to harm; or (2) an intent to place a person unreasonably at risk of harm," interpreting the latter to create a standard of recklessness, defined as,

> when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences."

*Uhlrig*, 64 F.3d at 573-574 (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992)).  The third element recognized by most Courts is that the government's conduct must "shock the conscience." *Id.*

**1.     Deportation of Ms. Saavedra to Colombia would constitute a "state created danger" and therefore violate her substantive due process rights.**

The government's deportation of Ms. Saavedra to Colombia would clearly meet the three elements constituting a "state created danger."

**a.  The government has created the danger that Ms. Saavedra would face if she was deported to Colombia.**

The government's actions meet the first prong of the "state created danger" test because the government's use of Ms. Saavedra's testimony against members of the Cali drug cartel created the danger that Ms. Saavedra faces from the drug cartel if she was deported to Colombia.  Given the history of violence by drug cartels, including executions and disappearances of those who cooperate with government authorities against its members, it seems clear that the government's use of Ms. Saavedra testimony against the Cali drug cartel has created a grave risk of death that Ms. Saavedra would face if she was deported to Colombia; in the words of one District Court, "few would quibble with the reality of the well-documented climate of fear and intimidation in Colombia that the powerful drug cartels have created." *United States v. Fuentes*, 988 F. Supp. 861, 863 (E.D. Pa. 1997).  Numerous other courts have recognized the obvious danger of harm or death that informants against Colombian drug cartels face in Colombia. *See e.g.*, *United States v. Blanco*, 861 F.2d 773, 776 (2d Cir. 1988) (divulging the identity of an informant against a Colombian drug cartel would have jeopardized the life of the DEA informant); *Mays v. DEA*, 234 F.3d 1324, 1330 (D.C. Cir. 2000) ("an informant reasonably fear[s] reprisal by conspirators to distribute cocaine"); *Rosciano v. Sonchik*, 2002 U.S. Dist. LEXIS 25419 (D. Ariz.); *Builes v. Nye*, 239 F. Supp. 2d 518 (M.D. Pa. 2003).  The D.C. Circuit in *Mays*, in fact, points to reports by the United States Sentencing Commission clearly indicating that informants against drug cartels, including those in Colombia, face a serious risk of harm or death from the cartels. *Mays*, 234 F.3d at 1330 (citing U.S. Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 4 (1997) (trafficking in crack cocaine closely associated with "systemic crime ... particularly the type of violent street crime so often connected with gangs,

guns, serious injury, and death"); U.S. Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 95-98 (1995) (chronicles empirics of violent crime, including "elimination of informers," that attends trafficking in crack and powder cocaine).

The government previously argued, Respondents' reply brief at 19-22, that Ms. Saavedra had not proved that she would face any danger if deported to Colombia. The DEA Threat Assessment and Parole Request draw the opposite conclusion. DEA agents corroborated the threats against Ms. Saavedra, Threat Assessment, attached as Exhibit A, and the Parole Request concludes that Ms. Saavedra's "deportation to Colombia could result in serious injury or death." Parole request, attached as Exhibit B, at 2.

In any case, there is no court decision requiring that the harm being faced must be reduced to the form of a personal threat.  In fact, in nearly every case where a court has found that the government had created a danger of harm such that their actions met the first prong of the "state created danger" test, has done so without the existence of any specific threats against the victim. *See e.g.*, *Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996); *Kniepp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996); *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995); *Sciotto ex rel. Sciotto v. Marple Newtown Sch. Dist.*, 81 F. Supp. 2d 559 (E.D. Pa. 1999).  Therefore, Ms. Saavedra need not demonstrate that she has received any personal threats from members of the drug cartels in Colombia, but merely that the government's actions has created a risk of harm that she would face if she was deported to Colombia.

There is clear evidence that the drug cartels in Colombia are extremely violent and take retribution against those that cooperate with government authorities in providing information about their illegal activities.  In this case, the DEA agrees that the government's solicitation

of Ms. Saavedra's cooperation, and its use of her information and live testimony against members of the Cali drug cartel, has created a grave risk of harm and death that Ms. Saaevdra would face if deported to Colombia.

> **b.  The government recklessly created the danger that Ms. Saavedra will face if she was deported to Colombia.**

The government, through both the U.S. Attorney who obtained Ms. Saavedra's cooperation and the USICE that is attempting to remove her to Colombia, acted with recklessness in using Ms. Saavedra's testimony against members of the Cali drug cartel and then attempting to remove her to Colombia.  Based on his experience with the operation of drug cartels in Colombia, and specifically with the Cali drug cartel, the U.S. Attorney who used Ms. Saavedra's testimony stated, "I firmly believe that Ms. Barreto would be at risk of death if she is deported." Letter of John P. Coffey, dated December 3, 2001, attached to First Am. Habeas Pet. as Exhibit E.  This is not knowledge that Mr. Coffey learned after the cases in which Ms. Saavedra participated were closed, this is knowledge that he possessed while obtaining Ms. Saavedra's cooperation and use of her testimony.  When the government obtained and used Ms. Saavedra's testimony against members of the Cali drug cartel, it knew that using such testimony would create a high risk of death if she was deported to Colombia. There is no evidence that the government intended to create this risk of harm, but the government clearly, "proceeded in conscious and unreasonable disregard of the consequences."  *Uhlrig*, 64 F.3d at 573-574 (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992)).  Knowing that Ms. Saavedra is a noncitizen, the government clearly knew that there was a possibility of her drug conviction resulting in her deportation to Colombia.

There is a large body of evidence demonstrating that those who cooperate with government entities providing information about drug cartels face serious danger of being killed in Colombia.  Due to the overwhelming evidence that informants against drug cartels face a grave risk of death in Colombia, the fact that Ms. Saavedra has raised this issue in her briefs, and the fact that the USICE has not put forth any evidence to the contrary, it seems clear that the USICE has knowledge that Ms. Saavedra would face the risk of serious harm or death if deported to Colombia.  By proceeding with these deportation proceedings, the USICE has, "proceeded in conscious and unreasonable disregard of the consequences" of deporting Ms. Saavedra to Colombia. *Uhlrig*, 64 F.3d at 573-574 (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992)).  The USICE has thus acted with recklessness with regard to the danger of harm or death faced by Ms. Saavedra if she was deported to Colombia.

### c.  Deportation of Ms. Saavedra to Colombia would shock the conscience.

The government's actions also meet the third element of a "state created danger" because their actions "shock the conscience."  The Supreme Court has noted that, "While the measure of what is conscience-shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'point the way.'" *City of Sacramento v. Lewis*, 325 U.S. 833, 547 (1998) (citing *Johnson* v. *Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  The Court further stated that, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 849.  Conscience shocking conduct does not require intentional harm, but merely "deliberate indifference." *Id*. at 849-850.  In describing the meaning of that term, the Court stated that, "the very term "deliberate indifference" implies, [that] the standard is sensibly employed only when actual deliberation

[by the government agents] is practical…" *Id*. at 851.  The actions of the government in the case at bar "shock the conscience" because they essentially involve the knowing sacrifice of Ms. Saavedra's life in order to procure the conviction of a few drug dealers.

In describing what is necessary for governmental action to "shock the conscience," the Tenth Circuit in *Uhlrig* has stated,

> to satisfy the "shock the conscience" standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.

64 F.3d at 574. In *Uhlrig* the Court found that the government's actions did not "shock the conscience" because the government did not intentionally create the harm or deliberately act indifferently toward the harm. *Id*. at 576.  In the case at bar, however, the government has clearly acted with deliberate indifference towards the harm of death being faced by Ms. Saavedra because it knows that deportation will subject her to a grave risk of death in Colombia due to the assistance procured by the government against the Cali drug cartel, but still seeks her deportation.

Contrary to the government's assertion in its brief, this is not "a routine case of a criminal who voluntarily cooperated with the government in exchange for leniency but now seeks to obtain more than what she received under the terms of the agreement she chose to enter." Reply brief at 15.  In an ordinary case, cooperation with the government does not place the cooperating person in plain danger of death.  In addition, in an ordinary case, the government does not solicit information concerning the actions of a violent drug cartel and then attempt to deport that person without protection into a country where members of the cartel would easily be able to kill the person.  The interests being balanced in this case are not that of

carrying out "the policy choice of Congress" to "remove aliens who Congress deems a danger to the American people" against the right of petitioner to remain in the United States. Reply brief, at 18. The interest being balanced against "the policy choice of Congress" is Ms. Saavedra's right to life that would be put in grave danger if deported to Colombia.

The government's treatment of Ms. Saavedra is unlike that given to ordinary informants and more like that which occurred in *Wang v. Reno,* 81 F.3d 808 (9th Cir. 1996), in which the government attempted to deport the petitioner back to China, his home country, after having him testify against Chinese traffickers. In *Wang*, the government paroled Mr. Wang into the U.S. from China in order to provide testimony against drug traffickers that were being prosecuted in the U.S. *Id*. at 811. The U.S. officials involved in the case were aware of the fact that Wang's confession implicating the traffickers facing prosecution in the U.S. was obtained through the use of torture by Chinese officials; the confession was obtained because the Chinese officials wanted Wang to implicate the traffickers facing trial in the U.S. *Id*. at 811-812. During his testimony at the trial in the U.S., Wang stated that his previous confession was obtained through the use of torture and he repudiated the confession that he gave to the Chinese government. *Id*. at 812. While procuring the testimony, the government was aware of the fact under oath, unless he committed perjury, Wang would be forced to admit that the Chinese government has subjected him to torture and would be forced to repudiate the confession that the Chinese government sought to procure. *Id*. at 813. The U.S. government was also aware of the fact that Wang's testimony would eliminate any chance of leniency in the proceedings he would face Chinese court system stemming from his participation in drug trafficking and would likely subject him to harsh treatment, torture, and possible execution if returned to China. *Id*. at 813, 818-819.

The government, after securing Wang's testimony, attempted to deport him back to China, where he would face a grave risk of serious harm due to the testimony that the government procured him. *Id.* Shocked by the actions of the U.S. government, the Court in *Wang* stated,

> We find it deplorable that the government, which has placed Wang in his present predicament, is not only not protecting him, but rather is actively trying to return him to a place where he will likely be tortured.

*Id.* at 820. The Court focused on the culpability of the government, finding that because it procured Wang's testimony with the knowledge that it would subject him to a grave risk of being killed in his home country, deporting him back to China would be a violation of his substantive due process rights,

> The government brought Wang to the U.S. in reckless disregard of the real possibility that his inculpatory testimony was false and that, if he told the truth, he would face torture and possible execution upon his return to the PRC.

*Id.* at 820-821.

The situation in Wang is strikingly similar to that facing Ms. Saavedra. In both cases the government procured the testimony of an informant with the knowledge that there was a high likelihood that the person would be deported back to a country where they would face a grave risk of death as a result of the their testimony. In both cases, the government procured the testimony with this knowledge, and then attempted to deport the person to a country where their testimony would subject them to a grave risk of death. Such deliberate indifference to the liberty interests of Mr. Wang and Ms. Saavedra is not offset by the governmental interest in deporting convicted drug traffickers – the due process clause forbids the government from being deliberately indifferent to the sacrifice of someone's life in order

to secure one more deportation.  Sacrificing Ms. Saavedra's life in order to deport her "shocks the conscience."

In its earlier briefing, the government focused on three issues that it argued eliminated any culpability of the government.  The first is the fact that Ms. Saavedra voluntarily cooperated with the government officials. Reply brief at 15.  The second is that condemning the government's actions in this case would create a "constitutional right to be placed in a witness protection program." Id. at 17.  The third is that because Ms. Saaevdra is not "especially vulnerable or incapable of caring for [her]self." Id. at 15.  These three arguments are misplaced and do nothing to change the fact that the government would violate Ms. Saavedra's substantive due process rights by deporting her to Colombia.

First, the fact that Ms. Saavedra voluntarily cooperated with the government does not eliminate its culpability in procuring her testimony that created the danger she faces in Colombia and then attempting to deport her back to Colombia. While there is a single district court case that holds that unsolicited, voluntary cooperation will not support a state-created danger argument, *Momennia v. Estrada*, 268 F. Supp. 2d 679 (N.D. Tex. 2003), that court held that a case where the government coerced or induced cooperation would support such an argument. Id. at 684.

Furthermore, the fact that Ms. Saavedra committed a voluntary action in the chain of events that led to the danger that was created does not eliminate the government's culpability – voluntary actions of the victim are not a bar to a finding of a violation of substantive due process rights, but merely one factor to consider in the general analysis of whether a substantive due process violation has occurred. *See e.g. White v. Rochford*, 592 F.2d 381, 386 (7th Cir. 1979).

In *Wang v. Reno*, the court noted that the fact that the petitioner had the voluntary choice of lying on the witness stand at the trial in the U.S., thus retaining the opportunity for leniency in Chinese courts if he was deported back to China. *Wang*, 81 F.3d at 813. Therefore, Wang did voluntarily decide to submit himself to the danger that he would face in China  he could have lied on the witness stand. *Id*.  The Court, however, found that this voluntary choice was not enough to eliminate the government's culpability in procuring his testimony and then attempting to deport him back to China. *Id*.at 818-819.

Another relevant case is *Wood v. Ostrander*, 879 F.2d 583, 586, 595-596 (9th Cir. 1989), in which the Court found that the police had violated the petitioner's substantive due process rights by stranding her in a high crime area in the middle of the night.  The Court found that simply because petitioner had voluntarily decided to place herself in danger by getting into a car with the person who ultimately raped her did not eliminate the government's culpability. *Id*. at 590.  The fact that the victim committed a voluntary act that placed her in danger of being raped did not offset the culpability of the government in elevating the degree of harm that she faced – if the government had not stranded her in a high crime area, she would not have faced the same risk of harm. *Id*.

Another relevant case is *Kniepp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996).  In *Kniepp*, shortly after midnight, police officers pulled over the victim and her husband for erratic driving. *Id*. at 1201-1202 The officer found that they were both drunk. *Id*.  The stop occurred a few blocks from their home. *Id*. at 1202.  Her husband asked the officers if he could walk to their home because there was a babysitter watching their children, the officers approved his request and let him leave. *Id*.  The officers did not take the victim home, but merely told her to leave the scene. *Id*.  Her husband assumed that the officers would take her home as she

was in such an inebriated state, and it was so cold that night, that she seemed to be unable to make it home on her own. *Id.* After the victim did not come home, her husband went out to look for her and saw one of the police officers that pulled them over. *Id.* After approaching the officers, they told him to leave or they would arrest him. *Id.* The victim's husband, while looking for her, saw someone resembling her description enter a car. *Id.* The victim was found shortly before 2 AM near an embankment unconscious and suffering from hypothermia. *Id.* As a result of her hypothermia, the victim suffers from permanent brain damage, is virtually blind, and cannot eat without the use of machines. *Id.* at 1202 n.16. The Third Circuit found that this evidence was enough, if proven at trial, to find that the government had violated the victim's substantive due process rights under a "state created danger" theory. *Id.* at 1211. The Court found the fact that there was evidence that the victim voluntarily entered a car with an unknown person who is likely to have been the person that harmed her and left her out in the elements did not eliminate the culpability of the government in elevating the degree of harm that she faced by leaving her outside after detaining her. *Id.*

Another relevant case is *Sciotto ex rel. Sciotto v. Marple Newtown Sch. Dist.*, 81 F. Supp. 2d 559 (E.D. Pa. 1999). In *Sciotto*, the Court ruled that the defendant school district could be held liable under a "state created danger" theory for bringing an alumni of the school to wrestle with the school wrestling team; the plaintiff was seriously injured (is now a quadriplegic) during practice by this much older and stronger alumni. *Id.* at 561. The Court rejected the school district's argument that because the school did not force the plaintiff to wrestle the alumni member and the plaintiff voluntarily chose to wrestle with him at practice, the school should be excused from liability. *Id.* at 564-565. The Court found that, "the proper

inquiry on causation under the state-created danger theory is not whether the state actor 'pulled the trigger,' but whether the state actor placed the plaintiff in a bullet's likely path." *Id*. at 565 n.8. Because the school "placed the plaintiff in a bullet's likely path" by inviting the alumni to practice with the wrestling team, it could be held liable under a theory of "state created danger." Id.

The decisions in *Wang*, *Ostrander*, *Kniepp*, and *Scottio* make it clear that the proper line of inquiry under a "state created danger" theory examines the actions of the government and determines whether it intentionally or recklessly created the risk of danger being faced by the plaintiff and whether the government's actions "shock the conscience." The fact that the victim committed a voluntary act in the process that led to the creation of the danger does not automatically eliminate the culpability of the government in creating the risk of danger, it is merely a factor to consider in determining the liability of the government.

The second argument that the government made in its prior briefing is that by granting the writ of habeas corpus, the Court would be creating a constitutional right to be placed in a witness protection program, a position that has been rejected by many courts. The government cites *Abbott v. Petrovsky*, 717 F.2d 1191 (8th Cir. 1983) and *Garcia v. United States*, 666 F.2d 960 (5th Cir. 1982) as affirming this proposition. The question of whether there is a constitutional right to be placed in a witness protection program is beside the point: Ms. Saavedra is not asking to be placed in a witness protection program. Ms. Saavedra is only asking for the government to refrain from deporting her to Colombia, which involves affirmatively placing her in a situation where she would face a grave danger of death. Recognizing her claim under the substantive aspect of the due process clause would not mandate that the government place informants in a witness protection program, but merely

that the government must refrain from deporting an informant to a country where she is in danger of death due to the cooperation solicited by the government.

A third argument made by the USICE in prior briefing is that Ms. Saaevdra is not the type of person that courts have found protected by a theory of "state created danger" because she is not "especially vulnerable or incapable of caring for [her]self." Reply brief at 15.  The USICE cites to cases in which the Court found relevant to its consideration of whether the government had violated the petitioner's substantive due process rights protected by the theory of "state created danger" that the petitioner was "especially vulnerable or incapable of caring for [her]self," but in none of the cases cited did the court find that such a characteristic was a *requirement* for a finding that the government had committed such a violation. *See Kniepp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); *Wood v. Ostrander*, 879 F.2d 583, 589-590 (9th Cir. 1989).  Several courts have found, in the exact circumstances presenting in this case, that the government had committed a violation of substantive due process rights under a "state created danger" theory without a finding of special vulnerability in the petitioner. *See Wang v. Reno*, 81 F.3d 808 (9th Cir. 1996); *Rosciano v. Sonchik*, 2002 U.S. Dist. LEXIS 25419 (D. Ariz.); *Builes v. Nye*, 239 F. Supp. 2d 518 (M.D. Pa. 2003).

One particularly relevant case is *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998).  In *Kallstrom*, the Sixth Circuit found that releasing the names, addresses, and other personal information of undercover police officers to the attorneys of gang members that the officers had provided information against would constitute a violation of the officers substantive due process rights protected by a theory of "state created danger." *Id.* at 1067.  Police officers are surely not "especially vulnerable or incapable of caring for [them]selves,"

yet the court found that the government's actions would violate their substantive due process rights protected by a theory of "state created danger."

## CONCLUSION

The Court has jurisdiction over this petition for a writ of habeas corpus because Ms. Saavedra has exhausted administrative remedies. The Court should prohibit the USICE from deporting Ms. Saavedra to Colombia because deportation would violate her substantive due process rights owing to the fact that the danger of harm that she would face in Colombia was created by the actions of the government.

Petitioner Yolanda Saavedra De Barreto, by

Michael Boyle, her attorney
Federal bar ct13518 Juris 408629
250 State Street, Unit C2
P.O. Box 335
North Haven, CT 06473
203 239-2299, fax 203 985-8207

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by mail March 3, 2005 to: William Brown, AUSA, Office of the U.S. Attorney, 157 Church Street, 27th floor, New Haven, CT 06510.

Michael Boyle